Rita Fayen SMITH, Plaintiff,

v.

**WYETH–AYERST LABORATORIES COMPANY, Defendant.**

No. 3:01 CV 355–V.

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 17, 2003.

Gregory M. Martin, Jones, Martin, Parris & Tessener, Raleigh, Janet Ward

Black, Donaldson & Black, P.A., Greensboro, for Rita Fayen Smith, plaintiff.

Stacey Stone Bennett, Womble, Carlyle, Sandridge & Rice, Charlotte, David M. Orta, Michael A. Rubin, Arnold & Porter, Washington, DC, Mark J. Spooner, Arnold & Porter, Los Angeles, CA, Michael T. Scott, Reed, Smith LLP, Philadelphia, PA, for Wyeth–Ayerst Laboratories Company, Division of American Home Products Corporation, American Home Products Corporation, both individually & as successor-in-interest to A.H. Robins Company, Inc., defendants.

### Memorandum and Order

VOORHEES, District Judge.

**THIS MATTER** is before the Court on the Defendant's Motions To Exclude Or Limit The Testimony Of Plaintiff's Expert Witnesses, filed August 30, 2002; Plaintiff's Motions To Exclude Expert Testimony of Drs. Steven M. Koenig, Kenneth W. Rictor, and Marta M. Kalinski, filed August 16, 2002 and August 30, 2002; and the parties' responsive memoranda and exhibits. The Court conducted an evidentiary hearing on December 4, 2002 and December 5, 2002, the focus of which was the parties' cross-motions to exclude evidence of causation. On December 10, 2002, Plaintiff conducted a *de bene* esse deposition of Dr. Carmine Dalto, which has been transcribed and filed with the Court for purposes of supplementing the record.

### I. Background

For purposes of the pending *Daubert* motions, the Court will only recite the relevant facts. Plaintiff suffers from Primary Pulmonary Hypertension ("PPH"), a rare but serious lung disease that exists when there is an elevation of the pressure in the pulmonary artery.[1] Pulmonary hy-

---

1. During the evidentiary hearing, PPH was also referred to as "sporadic pulmonary arte-

pertension can occur as a result of heart disease, liver disease, sleep apnea, blood clots in the lungs, sickle cell anemia, collagen vascular disease, and other causes. Pulmonary hypertension can occur idiopathically or sporadically, meaning it occurs without an identifiable cause. When there is no known cause, the disease is called "primary pulmonary hypertension" or PPH. PPH occurs in the general population at the rate of 1 to 2 cases per million annually. Women between the ages of twenty (20) and fifty (50) are considered a high risk group for the disease.

The landmark epidemiological study exploring the relationship between diet drugs and PPH is the International Primary Pulmonary Hypertension Study ("IPPHS"), published in the New England Journal of Medicine on August 29, 1996. IPPHS co-authors include Dr. Lucien Abenhaim of McGill University in Montreal, Canada; Dr. Francois Brenot of Antoine Beclere Hospital in Paris, France; and Dr. Stuart Rich of the Rush Heart–Lung Institute in Chicago, Illinois (Plaintiff's expert). The main objective of the IPPHS was to assess the role of several known or suspected risk factors in the development of PPH, including anorectic agents.[2] The IPPHS, a case-controlled study, considered 95 PPH cases, along with 335 physician-based control

cases from France, United Kingdom, Belgium, the Netherlands, and Switzerland.

Although the exact mechanisms of action of the anorexigens in PPH have not been definitively established, the IPPHS confirmed that the use of anorexigens (or appetite suppressants) is, in fact, a risk factor for PPH.[3] More specifically, the adjusted odds ratio for those exposed to at least one anorexigen prior to the onset of symptoms was **6.3 (95% CI: 3.0–13.2)** if all past exposures were considered and 10.1 **(95% CI: 3.4–29.9)** for recent users, or those who experienced symptoms within twelve (12) months of the last exposure. For those who used anorexigens for a duration of more than 3 months, the odds ratio was 23.1 (95% CI:6.9–77.7).[4]

Between 1995 and 1997, Plaintiff Rita Smith was prescribed a combination of Pondimin[5] (name brand for fenfluramine) and Phentermine, commonly known as "Fen–Phen," by two (2) different physicians. Plaintiff used fen-phen intermittently for a total of 8 ½ months, with her last use in April 1997.[6] According to Plaintiff, she first experienced shortness of breath (or dyspnea), a symptom of PPH, in February of 2000. She also noticed shortness of breath when exercising in November 2000. However, Plaintiff did not seek medical treatment until April 2001. On

---

rial hypertension" or "familial pulmonary arterial hypertension." (12–5–02 Trans. at 9.)

2. More specifically, the following factors were considered: age, gender, obesity, medical and surgical history, obstetric history, comorbidity, smoking, alcohol, caffeine, oral contraceptives, selected classes of drugs (cocaine and / or intravenous drugs), and environmental factors.

3. The type of anorexigens analyzed included fenfluramine derivatives and amphetamine-like anorexigens. Adjusted odds ratios were not calculated for individual drugs.

Other risk factors confirmed by the IPPHS, none of which are present in this case, were familial PPH, cirrhosis, and HIV infection.

4. The information contained in parentheses corresponds with the confidence level and interval for each odds ratio.

5. Pondimin is the brand name for fenfluramine. Redux, which is also mentioned in the medical literature and is a derivative of fenfluramine, is the brand name for dexfenfluramine.

6. The specific time periods are: March 1995—3 months; Spring 1996—4 months; and March 1997—1 month.

May 18, 2001, Plaintiff was diagnosed with diet-drug induced Primary Pulmonary Hypertension ("PPH") by Dr. Dalto. At the time of her diagnosis, Plaintiff presented with systolic pulmonary pressures close to 100 mmHg and right ventricular hypertrophy.[7] Shortly thereafter, Dr. Dalto referred Plaintiff to Duke University's Pulmonary Hypertension Clinic. On June 19, 2001, after the referral to Duke, Dr. Tapson confirmed Plaintiff's diagnosis. Plaintiff's treating physicians assisted in ruling out other potential causes and agree with this diagnosis. Defendant's expert disagrees, and opines that Plaintiff's PPH is 'sporadic,' or that the cause is unidentifiable.

## II. Discussion of the Law

■ Expert testimony is admissible under Rule 702 if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); FED. R. EVID. 702. The first prong requires an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable, while the second prong involves relevance. *Id.* at 590–92, 113 S.Ct. 2786. In assessing whether an expert's opinion is sufficiently reliable and relevant, the Court, as gatekeeper, conducts a flexible inquiry, focusing on the principles and methodology employed by the expert rather than the conclusions reached. *Id.* at 594–95, 113 S.Ct. 2786.

■ In determining reliability, the following factors, if applicable, should be considered: 1) whether the expert's reasoning or methodology has been or could be test-

ed; 2) whether the expert's reasoning or methodology has been subject to peer review and publication; 3) the known or potential rate of error; 4) the level of acceptance of the expert's reasoning or methodology by the relevant professional community. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149–50, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. According to the Fourth Circuit, the court should be conscious of two guiding, and sometimes competing, principles.

On the one hand, the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. *Cavallo v. Star Enter.,* 100 F.3d 1150, 1158–59 (4th Cir.1996). **And the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct.** *Id.* As with all other admissible evidence, expert testimony is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. On the other hand, the court must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to "be both powerful and quite misleading." *Id.* at 595, 113 S.Ct. 2786. And given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded. *U.S. v. Dorsey,* 45 F.3d 809, 815–16 (4th Cir.1995).

*Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999)(emphasis added).

---

7. Right ventricular hypertrophy is a thickening and enlargement of the right ventricle of the heart. As explained by Plaintiff, "[w]hen pulmonary arteriopathy has progressed far enough in a PPH patient to create higher pulmonary vascular resistance, the right ventricle has to work harder."

■ An expert must account for "how and why" he or she reached the challenged opinion. *General Electric Co. v. Joiner,* 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Generally, before an expert opinion on causation is allowed, the expert must be able to "take serious account of other potential causes," and offer an explanation as to why a proffered alternative was not the sole cause. *Westberry,* 178 F.3d at 265. However, an opinion is not deemed unreliable simply because all other potential causes cannot be excluded. *Id.; Cooper v. Smith and Nephew, Inc.,* 259 F.3d 194, 202 (4th Cir.2001). Instead, the alternative causes suggested by a defendant normally affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony. *Id.*

■ Speculation is not a reliable basis for expert opinion. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. In addition, inferences are not allowed unless the inference is derived using scientific or other valid methods. *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999). Epidemiological data is admissible evidence on the issue of causation. However, the epidemiological data cannot support an inference that a suspected risk factor caused an injury unless:

(i) the analysis of the data is statistically significant [8] under scientifically accepted statistical norms;

(ii) the statistical relationship is sufficiently strong to support a "more likely than not" [9] inference; and

(iii) the data being relied upon "fits" [10] the facts of plaintiff's individual case.

■ The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786. In other words, the proponent must show that there is a reliable basis for concluding that the exposure more likely than not caused the specific harm alleged. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1320 (9th Cir.), *cert denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)("*Daubert II* ").

### III. Analysis

#### 1. Defendant's Motion 1

Plaintiff seeks to present evidence to the jury from which one can infer that Plaintiff's use of fen-phen caused her PPH. The Defendant objects, arguing that the epidemiological study establishing an association between fen-phen and PPH does not "fit" with the facts of this case. In order to find in favor of Defendant on this issue, however, the Court would have to disregard the overall, and statistically significant, finding of the IPPHS study, which establishes that use of appetite-suppressant drugs, regardless of duration of exposure and/or the onset of symptoms, results in an increased risk (630%) of PPH. For the reasons stated herein, Defendant's mo-

---

8. A study is considered "statistically significant" only when the odds ratio is expressed with a 95% confidence interval (consistently) and when that interval does not include an odds ratio of 1.0 or below.

9. Some courts have found that you can infer something is more likely than not when the relative risk is greater than 2.0 or the attributable risk exceeds 50%. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Federal Judicial Center, pg 384–85 (2nd Ed.2000) [hereinafter "Reference Manual".]

10. The term "fit" refers to the relationship of an epidemiological study to the facts of the case and the issues in dispute and involves evaluating the study's probative value. *Reference Manual,* pg. 383 n. 134.

tion will be *granted in part* and *denied in part.*

As Plaintiff argued during the hearing, the Court's focus should not necessarily be on the existing epidemiological data, but rather on the process a treating physician, or a doctor in clinic, would follow. Indeed, "[u]nder *Daubert,* epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir.1995). "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry,* 178 F.3d at 262. Plaintiff's evidence on causation, namely, Dr. Rich's differential diagnosis, is admissible under Rule 702 and *Daubert.* Applying the reliability factors set forth within *Daubert,* Defendant's concerns are addressed in turn.

Dr. Rich's reasoning and methodology, although not subject to a conclusive scientific procedure or test, is sufficiently reliable. Defendant contends that because PPH can occur idiopathically, or without an identifiable cause, and because there is no way to distinguish an idiopathic case

from a diet-drug induced case of PPH, that Plaintiff's opinion evidence is unreliable. However, as noted, *supra,* differential diagnosis doesn't require plaintiff to rule out every other cause, only to offer an explanation and take account of the other potential causes. *Westberry,* 178 F.3d at 262. Therefore, the existence of idiopathic PPH doesn't render Dr. Rich's opinion inadmissible, but instead goes to the weight of the evidence.[11]

While it is true that epidemiological data is not required in order to prove causation, epidemiological data is key in this case because interpretation of the available data was considered by the parties' experts in the differential diagnosis (or 'algorithm') process. As Dr. Koenig explained during his testimony, the epidemiological data comes into play because there is no way to distinguish the pulmonary arterial hypertension sporadic from diet drug-related pulmonary arterial hypertension. (12–5–02 Trans. at 13.) Consequently, the IPPHS was the primary subject of the *Daubert* hearing.[12]

As an initial matter, the Court is not persuaded that the IPPHS conclusively ruled out any increased risk of PPH for past users of fenfluramines. In testimony regarding the IPPHS protocol and the study's "power," Dr. Rich testified that the

---

**11.** Attempting to bolster its argument, Defendant points out, and Plaintiff does not dispute, that Plaintiff falls within the demographic group most susceptible to PPH—women between the age of 20—50. The Court is not persuaded. Plaintiff falling within the high risk demographic group for PPH is not determinative of causation for the same reasons Defendant challenges Dr. Rich's diagnosis. This is merely evidence to be considered by the jury in conjunction with the expert opinion testimony.

**12.** The Court attributes little weight to the SNAPH epidemiological data cited by Defendant during the evidentiary hearing. (Defen-

dant's Exh. 64) In SNAPH, the relationship between fenfluramines and *secondary* pulmonary hypertension was explored whereas Plaintiff in this case suffers from *primary* pulmonary hypertension. Defendant's own expert, Dr. Koenig, relied primarily on the IPPHS for his opinion in this case. (12–5–02 Trans. at 47.) Dr. Koenig stated that the IPPHS is the "best well controlled study that exists" and the best study to address this issue. (12–5–02 Trans. at 7, 13.) Referring to the IPPHS again, he stated that, "We only have one good study in the medical literature with the right control group and that's the IPPHS study." (12–5–02 Trans. at 42.)

IPPHS was simply not "powered" to consider the delayed onset issue presented in this case, while Drs. Makuch and Koenig insisted that the protocol revealed the exact opposite. Defendant relies on a statement in the protocol that stratified analyses should be possible in order to identify potential high risk groups. (1992 IPPHS Protocol at 15.)

"The power of a study expresses the probability of finding a statistically significant association of a given magnitude (if it exists) in light of the sample sizes used in the study."[13] *Reference Manual*, pg. 362. Stated differently, the term "power" refers to "the chance that a statistical test will declare an effect when there is an effect to declare" or "the probability of rejecting the null hypothesis when the alternative hypothesis is right." *Id.* at 125 n. 144.[14] In this case, the concept of power is key because it's helpful in evaluating whether the study's outcome, particularly with regard to past users, is exonerative or inconclusive. *Reference Manual*, pg. 362.

Therefore, if sufficiently powered to determine the latency issue, the failure to obtain statistically significant results with regard to past users would favor Defendant's interpretation of the IPPHS and provide evidence that the risk of PPH does not persist more than a year after last exposure. However, the sample size for the past users category consisted of only seven (7) cases. (12–4–03 Trans. at 189–90.) More importantly, Dr. Rich, a co-author of the study, testified that the primary 'end point' of the IPPHS was to determine the magnitude of the association.[15] (12–4–02 Trans. at 117, 171; Rich Affidavit, ¶ 5.) In other words, the IPPHS was designed and powered for this specific purpose even though the study also considered the temporal relationship and whether the risk diminished over time.[16] The Court's understanding of epidemiology 'basics' is consistent with Dr. Rich's explanation in that both temporal relationship and diminishing risk are factors to be considered when assessing whether an association can support a causal relationship.[17] In light of Dr.

13. Thus, consistent with Plaintiff's argument regarding sample size, sample size clearly has an impact on the results of a study in that "[d]iscerning subtle differences in the population requires large samples." *Id.* at 125–26.

14. "Null hypothesis" is defined as a hypothesis that states that there is no true association between a variable and an outcome. At the outset of any observational or experimental study, the researcher must state a proposition that will be tested in the study. In epidemiology, this proposition typically addresses the existence of an association between an agent and a disease. Most often, the null hypothesis is a statement that exposure to Agent A does not increase the occurrence of Disease D. The results of the study may justify a conclusion that the null hypothesis (no association) has been disproved (e.g., a study that finds a strong association between smoking and lung cancer). A study may fail to disprove the null hypothesis, but that alone does not justify a conclusion that the null hypothesis has been proved. *Reference Manual*, pg. 393.

15. "Association" refers to the degree of statistical relationship between two or more events or variables. Events are said to be associated when they occur more or less frequently together than one would expect by chance. Association does not necessarily imply a causal relationship. *Reference Manual*, pg 387.

16. The phrase "temporal relationship" was used by the parties throughout the evidentiary hearing. In Dr. Rich's testimony, he explained that one of the aspects of a causal relationship was temporal association. According to Dr. Rich, temporal association refers to the notion that when a drug causes a disease, the longer you are exposed to the drug, the higher your risk of the disease. (12–4–02 Trans. at 117.) Defendant, on the other hand, referred to temporal relationship as indicating a closer proximity in time.

17. There are specific criteria, sometimes referred to as the "Bradford Hill" criteria, to consider when determining whether an epidemiological study establishing an association is

Rich's testimony, as well as the sample size, the Court is persuaded that the IPPHS was not sufficiently powered to determine conclusively the risk for past users such as Plaintiff.

Despite its inability to squarely address the latency issue presented in this case, the IPPHS provides reliable, scientific evidence to support Plaintiff's theory of causation. This is true despite the parties' agreement that the specific subset analysis or study that would neatly "fit" with the facts of this case has not been done.[18] In other words, there is no epidemiological data explaining what associated risk develops for users of fen-phen who took the diet drug for longer than 3 months and did not display symptoms within twelve (12) months of their last use.[19] However, that is not to say that the IPPHS is not relevant, or does not "fit."[20] As explained in The Federal Judicial Center's Reference Manual on Scientific Evidence,

"In a toxic substance case in which cause in fact is disputed, an epidemiologic study of the **same agent** to which the plaintiff was exposed that examined the association with the **same disease** from which the plaintiff suffers would undoubtedly have sufficient 'fit' to be a part of the basis of an expert's opinion."

*Reference Manual,* pg. 383 n. 134 (emphasis added). Given the above, the IPPHS is certainly relevant and provides a sufficient "fit" to serve as a basis for the proffered expert testimony.

Likewise, Plaintiff's recognition that the risk of developing PPH as a result of fenfluramine use diminishes over time does not render Dr. Rich's opinion unreliable. Dr. Rich testified that the authors of the IPPHS suspected that the risk of diet-drug induced PPH diminished over time, and that the study confirmed their suspicions. (12–4–02 Trans. at 117.) Nonetheless, the IPPHS did not conclude that there is no risk beyond twelve (12) months of the last use. The Court agrees with Plaintiff that it defies logic to contend that

---

such that a causal relationship can be inferred. While a complete discussion is not required, the following factors should be considered by epidemiologists in rendering opinions about causation: 1) temporal relationship; 2) strength of the association; 3) dose-response relationship; 4) replication of the findings; 5) biological plausibility (coherence with existing knowledge); 6) consideration of alternative explanations; 7) cessation of exposure; 8) specificity of the association; and 9) consistency with other knowledge. *Reference Manual on Scientific Evidence,* Federal Judicial Center, pg 375 (2nd Ed.2000); FJC Broadcast, "Science in the Courtroom, Program 5: Basic Principles of Epidemiology."

18. When asked by opposing counsel whether the risk of PPH persists for 5 to 10 years after use, Dr. Rich testified that in order to determine what the 'latent interval'(or longest time period from last use of the drug) is, a trial would have to be designed to study it. (12–4–02 Trans. at 183, 187,194.) Likewise, Dr. Koenig stated in his Rule 26 expert witness disclosure that no studies exist that specifical-

ly address the latency issue posed here. (Koenig Affidavit, ¶ 16)

19. The subset analysis and corresponding odds ratio for those cases falling within the duration longer than 3 months category did not take into account the onset of symptoms despite the fact that approximately 20% of the IPPHS patients first experienced symptoms more than a year after their exposure. (2–4–02 Trans. at 121.) Likewise, the odds ratio for those within the past users category (symptoms outside of the 12 months period), did not take into account which of these subjects used the drug for longer than 3 months. (12–4–02 Trans. at 48,190.)

20. Defendant cites various cases, none of which are controlling authority, in support of its contention that the IPPHS does not "fit." However, a review of the case law generally reveals that many district courts simply adopt a much more restrictive view than the undersigned, infringing on plaintiffs' right to a jury trial in some instances.

the risk existed at day 364, but not at day 366. (12-4-02 Trans. at 120, 127.) As alluded to earlier, exactly how much time the increased risk persists is the unknown here. Even so, this unknown does not render the Plaintiff's proffered opinions unreliable. Instead, the Court must merely ensure that the proposed testimony is supported by "appropriate validation—i.e., 'good grounds,'" based upon what is known. *Benedi,* 66 F.3d at 1383.

The IPPHS, combined with the related medical literature, including case series reports, provides the validation needed to establish admissibility. Drs. Rich and Tapson refer to such case reports. Standing alone, case reports may or may not be a sufficient basis for expert opinion regarding causation. Nonetheless, case reports can provide supportive or corroborating data, particularly with rare diseases such as PPH. According to the *Reference Manual,*

> Physicians also have access to case reports or case series in the medical literature. These are reports in medical journals describing clinical events involving one individual or a few individuals. They report unusual or new disease presentations, treatments, or manifestations, or suspected associations between two diseases, effects of medication, or external causes of diseases.

> Case reports lack controls and thus do not provide as much information as controlled epidemiological studies do. However, case reports are often all that is available on a particular subject because they usually do not require substantial, if any, funding to accomplish, and human exposure may be rare and difficult to study. Causal attribution based on case studies must be regarded with caution. However, such studies may be carefully considered in light of

other information available, including toxicological data.

*Reference Manual,* pg. 474-75. Thus, Plaintiff's point is well taken that doctors often rely on case reports in the practice of medicine. (12-4-02 Trans. at 68-9.) Additionally, Dr. Tapson explained throughout his deposition that while experts in a particular discipline may very well disagree as to what a specific case report means, in order to glean helpful information, each case report or series should be considered and weighed individually. Defendant improperly asks the Court to weigh the evidence here. Moreover, Defendant's conclusory argument that all case reports, including those that identify other delayed onset cases, cannot be relied upon by Plaintiff's experts lacks merit. For these reasons, the case reports may be considered in conjunction with the epidemiological data.

Moreover, Dr. Rich's approach is not unlike a method approved by the Fourth Circuit in *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975 (4th Cir.1987). In *City of Greenville,* plaintiff's expert, relying on data showing a correlation between asbestos-related diseases and high levels of exposure of asbestos, testified that even very low levels of asbestos exposure could cause serious harm. There was no epidemiological data available determining the minimum level of exposure that could support the correlation. Nor did plaintiff's expert base his testimony on identical case studies. The Fourth Circuit approved of plaintiff's expert's methodology—extrapolating the risk of low level exposure downward from results obtained in studies involving high-level exposures—and found the expert testimony reliable.

In this case, Dr. Rich agrees that the risk of PPH diminishes over time, acknowledges that the epidemiological study that would resolve the latency issue in this

case has not been done, and opines that the overall results of the IPPHS can not be ignored. Just as the data on high-level exposure did not rule out harm due to low-level exposure in *City of Greenville*, Dr. Rich's interpretation of the IPPHS does not mean that the risk of diet-drug induced PPH is nonexistent upwards of twelve (12) months after use. For these reasons, the Court rejects the parties' efforts to rely *solely* on the subset results within the IPPHS, namely, users for duration of 3 months or more (23.1 odds ratio), and the non-statistically significant results (2.4 odds ratio) for past users. Although the entire IPPHS and all of its findings are admissible as the basis of the experts' respective opinions, the jury will be instructed that they are only to consider the statistically significant findings within the IPPHS as substantive evidence in considering the issue of causation and may not rely solely on the past users odds ratio.[21] *Flue–Cured Tobacco Coop. v. United States EPA,* 4 F.Supp.2d 435, 461–62 (M.D.N.C.1998); *Wheelahan v. G.D. Searle,* 814 F.2d 655, 1987 WL 267679 (4th Cir.1987)(unpublished)("The court cannot properly draw any conclusions about the increased risk when that increased risk is not statistically significant.")

As for peer review and publication, Defendant does not seriously question that Plaintiff's expert, Dr. Rich, either authored, or otherwise contributed to, most of the publications in this discipline. Nor is there is any doubt that the IPPHS

established an association between fenfluramines and PPH. Based on the strength of the association, the dose-response relationship, and temporal relationship, and the like, a causal relationship (i.e., general causation) can be reasonably inferred.[22] In addition, there are numerous published case series cited by Plaintiff documenting suspected diet-drug induced PPH cases where symptoms occurred beyond twelve (12) months of last use. Dr. Rich's views have been adequately subjected to peer review and publication.

The known or potential rate of error should also be considered when evaluating the reliability of a particular scientific technique. Because the Court is not asked to consider a particular scientific technique, and because the Court will instruct the jury that in terms of inferring causation, they should only consider the statistically significant data in the IPPHS, this factor has limited applicability here and need not be discussed. *Benedi,* 66 F.3d at 1384.

■ Further, Dr. Rich's reasoning and methodology is generally accepted in the medical field. In *Westberry,* the Fourth Circuit Court of Appeals held that "a reliable differential diagnosis provides a valid foundation for an expert opinion." *Westberry,* 178 F.3d at 263; *Benedi,* 66 F.3d at 1384 ("We will not declare such methodologies invalid and unreliable in light of the medical community's daily use of the same methodologies in diagnosing patients.") A

---

**21.** In fact, Dr. Rich suggested that limiting evidence to the overall odds ratio of 6.3 was the only proper application of the IPPHS results to a case that was not included in the actual study and Plaintiff concedes as much in her opposition brief. (12–4–02 Trans. at 116, 119–20, 129–133, 172–73, 176–77,180.)(Plaintiff's Response at 50.) Dr. Rich stated that it was inappropriate to "cherry pick" the subset you like best. (12–4–02 Trans. at 175.) He also explained that the

subset analyses were done for the sole purpose of establishing causation. (12–4–02 Trans. at 186.)

Ironically, aside from agreeing that failure to obtain a statistically significant result did not render test results completely meaningless, Dr. Rich directly contradicted Dr. Poole's confidence interval assessment.

**22.** *Reference Manual,* pg 375.

differential diagnosis, like other expert testimony, is deemed reliable when supported by scientific, technical, or other specialized knowledge, or inferences derived from scientific or other valid methods. *Cooper,* 259 F.3d at 200 (*citing Oglesby v. General Motors Corp.,* 190 F.3d at 250). In addition, it was not necessary for Dr. Rich to have examined Plaintiff personally in order for him to render a reliable differential diagnosis. *Cooper,* 259 F.3d at 203. In sum, differential diagnosis methodology "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." *Westberry,* 178 F.3d at 262. Despite the disagreement between the parties' experts on the latency issue, there is no indication that Dr. Rich's testimony is not reliable or trustworthy. In fact, the number of Plaintiff's treating physicians (four) that arrived at the same conclusion, and rendered the identical diagnosis, supports Plaintiff's position.[23]

Finally, Defendant appears to argue that Plaintiff's evidence is insufficient as a matter of law. However, Rule 702 and *Daubert* do not support such a contention. Rather the Court is to consider whether Plaintiff's proffered expert testimony is admissible under the standards recited herein.[24] *See generally, Ambrosini v. Labarraque,* 101 F.3d 129 (D.C.Cir.1996)("dispositive question under *Daubert,* is whether testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial.")

### 2. *Defendant's Motion 2*

■ Defendant Wyeth further seeks to preclude Plaintiff's treating physicians from rendering expert opinions regarding Plaintiff's diagnosis, prognosis, the causes or risk factors for PPH, and the most likely cause of Plaintiff's PPH.[25] Plaintiff disagrees, arguing that her treating physicians are at least as qualified to provide opinion testimony on causation as Defendant's expert, Dr. Koenig.[26] Plaintiff further argues that it is premature for the Court to consider whether Plaintiff's treating physicians' testimony is cumulative prior to hearing any evidence.

With one exception, the Court agrees with Defendant that Plaintiff's treating physicians are not qualified to provide opinion testimony on the causes of PPH or its relationship to anorexigens. As Defen-

**23.** As explained herein, with the exception of Dr. Dalto, Plaintiff's treating physicians will not be able to testify regarding causation, but will be limited to providing factual testimony.

**24.** The Defendant should not interpret this statement of the law an invitation to file a dispositive motion alleging insufficiency of the evidence on the issue of causation. It is clear to the undersigned, and should be to the parties as well, that this is a classic jury question that cannot be determined as a matter of law. Should Defendant move for summary judgment on this basis, it will be summarily denied.

**25.** Plaintiff's treating physicians, *none of which are retained expert witnesses in this case,* include: 1) Dr. Edward B. McMillan

(cardiologist specializing in noninvasive cardiology, valvular pathology); 2) Dr. John A. Pasquini (cardiologist specializing in "interventional cardiology" or treating blocked arteries, catheter techniques, and valvular diseases); 3) Dr. Carmine Dalto (pulmonologist); and 4) Dr. Bernard G. Boka (family practitioner).

**26.** In asserting this argument, Plaintiff nearly concedes that Dr. Koenig is qualified for purposes of Rule 702 to offer opinion testimony regarding causation notwithstanding the fact that he lacks the specialized training that Drs. Rich and Tapson possess. According to Plaintiff, Dr. Koenig's "modest qualifications" are a factor to consider in evaluating Plaintiff's motion to exclude Dr. Koenig's testimony.

dant points out, any expert, including physicians, must have the specialized knowledge or skill in the specific area in which the testimony is proffered. Thus, Defendant seeks a ruling that limits the treating physicians' testimony to factual testimony and / or analysis of any tests performed ruling out other causes of Plaintiff's PPH.[27]

Plaintiff's treating physicians are surely experts in their specialty areas. However, with the exception of Dr. Dalto, they lack the specialized knowledge or experience in PPH, PH, or the relationship between diet drugs and PPH necessary to assist the jury in understanding the etiology of Plaintiff's PPH. The rationale behind Rule 702 and *Daubert* is to "make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. Plaintiff contends that if Plaintiff's physicians are qualified to treat her, they are certainly qualified to assist the trier of fact in understanding Plaintiff's medical condition.[28] With this proposition, the Court fully agrees. However, in terms of actually treating Plaintiff for PPH, even Dr. Dalto referred Plaintiff to another physician for additional treatment, undercutting Plaintiff's argument to some degree. Even so, diagnosis and prognosis, within the limits identified herein, are within the province of Plaintiff's treating physicians. Therefore, Drs. McMillan, Pasquini, Boka, and Dalto will be allowed to provide factual testimony regarding examination, observations, in addition to Plaintiff's PPH diagnosis and prognosis. With the exception of Dr. Dalto, Plaintiff's treating physicians will not, however, be allowed to specify that they believe or agree that Plaintiff's PPH was induced by her exposure to fen-phen.

 Dr. Dalto is distinguishable from the other treating physicians in that he is a board-certified pulmonologist, has treated numerous cases of pulmonary hypertension, has diagnosed and treated a number of PPH patients, and has reviewed a substantial portion of the relevant medical literature. In addition, Dr. Dalto's opinion, documented over three (3) years ago and prior to the commencement of litigation, is in that respect, more reliable than the opinions to be offered by the retained experts in this case. For this reason, Dr. Dalto will be allowed to provide expert testimony on the etiology of Plaintiff's PPH.

Further, because the Court will allow Drs. Rich, Tapson, and Dalto to provide expert opinion testimony on the issue of causation, a case can be made for excluding needlessly cumulative evidence by treating physicians. However, given Plaintiff's response, the undersigned is satisfied that Plaintiff does not seek to present mere cumulative evidence via her medical witnesses.[29] (Plaintiff's Response to Motion 2 at 17.)

### 3. *Defendant's Motion 3*

 Defendant contends that Drs. Dalto and Boka should not be allowed to

---

27. For example, Dr. Pasquini conducted tests that "excluded other heart causes of [Plaintiff's] pulmonary hypertension" and Dr. McMillan is expected to confirm that left-sided heart disease was not the cause of Plaintiff's PPH.

28. The Court will not undertake the process of defining Plaintiff's treating physicians' areas of expertise within this Order.

29. "Our examination of Plaintiff's treating physicians will likely focus on their treatment of Ms. Smith, the objective testing they ran, and their explanation of what those test results mean in this case." (Plaintiff's Response to Motion 2 at 17.)

provide expert testimony regarding the onset of Plaintiff's PPH.[30] Plaintiff disagrees and contends that in addition to their clinical experience, Drs. Dalto and Boka rely primarily upon their understanding of "basic physiology" in concluding that Plaintiff's condition was chronic by the time she was diagnosed with PPH.

Plaintiff asks the Court to recognize the biological variability that exists between individual PPH cases, as is the case with many other diseases. According to Plaintiff, Drs. Dalto and Boka will explain objective medical findings supporting the theory that Plaintiff suffered from PPH for a period of time before noticing symptoms. The first of these findings involves Plaintiff's right ventricular hypertrophy or "RVH."[31] The second finding is Plaintiff's elevated systolic pulmonary artery pressures. Relying in part on these findings, Drs. Dalto and Boka opine that examination of Plaintiff at the time of the PPH diagnosis revealed "chronicity." Thus, they believe Plaintiff's PPH developed approximately twelve (12) to eighteen (18) months earlier than Plaintiff's first reported onset of symptoms.[32] Dr. Dalto explains that his opinion on this point is based on "a cumulative block of knowledge about the physiology" and is derived from different sources including work with pulmonary embolism, historical animal experiments, and his understanding of how muscle responds to a pressure stress in various conditions.[33] (Plaintiff's Tab A/Dalto Deposition at 120–22.) The same analysis applies to Dr. Boka and his observations. Although Dr. Boka is not a board-certified pulmonologist, any objective medical observations regarding Plaintiff's condition based upon examination are proper areas of testimony.

Consistent with the Court's ruling on Motion 2, Drs. Dalto and Boka will both be able to provide factual testimony regarding Plaintiff's condition. As noted, in light of his vast clinical experience and his certification in pulmonology, Dr. Dalto's testimony will be more expansive, including a broader range of opinion testimony—i.e., etiology. More specifically, testimony regarding Plaintiff's systolic pulmonary pressures, the condition of her right ventrical, Plaintiff's medical history, and any conclusions drawn, or actions taken as a result, are all proper areas of testimony. As is true for Drs. Rich and Tapson, Dr. Dalto will also be allowed to provide testimony that the onset of PPH is typically insidious, and that patients are often asymptomatic in the early stages of pulmonary hypertension. In terms of what these facts ultimately reveal regarding Plaintiff's actual onset date will, of course, be a fact for the jury to decide. Defendant's third motion will be *denied.*

### 4. *Defendant's Motion 4*

■ Defendant seeks to limit the testimony of Dr. Lemuel A. Moye to the area of biostatistics. Explained in more detail, Defendant argues that Dr. Moye should only be allowed to provide testimony regarding the statistical interpretation of medical data and the manner in which

---

**30.** Because this motion is really a derivative argument of Defendant's second motion, the Court refers to that analysis.

**31.** At the time of diagnosis, Plaintiff's right ventricle was "five to six times thicker than normal." (Plaintiff's Tab A / Dalto Deposition at 122.)

**32.** For purposes of the *Daubert* hearing, Defendant did not contest that Plaintiff's onset could be as early as February 2000.

**33.** To the extent Dr. Tapson disagrees with Dr. Dalto, the two (2) opinions regarding the significance of RVH and its relationship to Plaintiff's PPH onset is for the jury to weigh.

medical studies should be designed as opposed to the standard of care, obesity, pharmacology, moral views, or FDA law. Defendant also argues that Dr. Moye is not a factual witness and, therefore, should not be allowed to provide factual or "intent" testimony.[34]

Dr. Moye is offered by Plaintiff as a "generic" expert witness. His proposed expert testimony is offered in the following areas: 1) a discussion of general epidemiology, including how epidemiologists determine if exposure to a particular medication is associated with a disease process; 2) the risks associated with exposure to fenfluramine and dexfenfluramine, including PPH and Valvular Heart Disease ("VHD"); 3) the risks of exposure versus the benefits of using diet drugs; 4) notice of the risks of PPH and VHD to Defendant from adverse drug event reporting, including a discussion of the relevant federal regulatory reporting and labeling requirements; and 5) discussion of Wyeth's conduct related to its notice of the risks of PPH and VHD associated with fenfluramine and dexfenfluramine, and its reporting of adverse drug events to the FDA.

Dr. Moye is an associate professor of biostatistics at the University of Texas School of Public Health with a Ph.D. in Community Health Science—Biometry. Dr. Moye holds an M.D. degree as well, and is licensed to practice medicine in Texas and Indiana. From 1995 to 1999, he was a member of "The Cardio–Renal Advisory Committee" to the FDA, which advised the FDA regarding approvals of drugs used in the treatment of cardiovascular and renal conditions. Dr. Moye has also participated in clinical trials of drugs evaluated by the FDA and repeatedly served as a clinical trial consultant in both the public and private sector. Dr. Moye has numerous peer-reviewed publications. He has also testified in other diet-drug cases.

Dr. Moye's "fact" and "corporate intent" testimony is inadmissible. Indeed, the MDL Court, Judge Bechtle, has already ruled that testimony regarding corporate intent is inadmissible.[35] (PTO 1332 at 21–22; PTO 1685 at 6.) The Court agrees with the MDL Court's rationale—that is, the jury should hear and / or see first-hand any relevant evidence pertaining to the Defendant's intent. Then the jury, not the witnesses, should consider the facts and make its own determination regarding Defendant's intent.

 As for risk / benefit analysis, Defendant concedes that Dr. Moye's consideration of the IPPHS is within his area of expertise. Notwithstanding this, Defendant argues that Dr. Moye is not qualified to testify about the risk / benefit analysis in this case due to his lack of specialized knowledge on the use of diet drugs to treat obesity. According to Defendant, the risk / benefit evaluation should be done on a case-by-case basis due to the risks associated with obesity in general, the serious-

---

34. During the evidentiary hearing, Defendant indicated its desire to address the Court further on its position regarding Dr. Moye. Due to time constraints, Defendant was unable to do so. For this reason, and given the numerous areas in which Dr. Moye is proffered, the Court will likely need to revisit the parameters of Dr. Moye's testimony at trial. However, the undersigned will try to provide as much guidance as possible within the instant Order.

35. Judge Bechtle stated that "any proffered expert testimony concerning the intent of [Wyeth] or any other entity (such as the FDA) shall be excluded on the basis that the question of intent is to be determined by the jury, not experts; and ... the otherwise admissible evidence of the intent of [Wyeth] or FDA leadership or personnel [is not excluded]." Plaintiff indicates her willingness to abide with Judge Bechtle's evidentiary rulings.

ness of a patient's obesity, consideration of any other complications, how a patient has responded to other therapies, and how the prescribing physician's other patients have responded to drug therapy.

Defendant seems to be describing the requisite area of expertise too narrowly. In addition, all of these factors, if relevant, can just as easily be explored thoroughly on cross-examination. Moreover, Defendant's criticism of Dr. Moye's preparation is curious. Dr. Moye has reviewed testimony from the FDA Advisory Committee hearings for Redux as well as the majority of the relevant medical literature in forming his opinion. The Court takes judicial notice that this process is not unusual, but rather is precisely how many experts go about developing an opinion within their disciplines. Given Dr. Moye's educational background, as well as his experience as a clinical trial investigator and consultant, his qualifications in this area are beyond question. Dr. Moye can provide testimony that will be helpful to the jury.

■ Plaintiff also seeks to use Dr. Moye's testimony to establish Defendant's knowledge of the risks associated with Pondimin and Redux. According to Plaintiff, Dr. Moye is able to provide expert testimony regarding adverse drug events, FDA reporting and labeling requirements, and the link between Aminorex and Pondimin. In support of its proffered expert witness, Plaintiff cites Dr. Moye's experience as a member of the FDA Cardio–Renal Advisory Committee, which required members to weigh the advantages and disadvantages of medications presented to the Advisory Committee for FDA

approval, and Dr. Moye's experience supervising the collection of adverse event reports to drug companies and to the FDA resulting from his involvement in clinical trials for manufacturers of pharmaceutical products. Defendant challenges Dr. Moye's proposed testimony in all of these areas.

In terms of reporting adverse drug events (or "ADEs"), Defendant questions Dr. Moye's knowledge of the applicable standard for reporting adverse drug events, claiming that Dr. Moye lacks knowledge about the pharmaceutical industry's standard as opposed to the FDA regulations and has no knowledge of the requirements for postmarketing adverse drug events that a manufacturer like Wyeth would be required to report.[36] Plaintiff asserts that the pharmaceutical industry standards are essentially the same as that required by the FDA. Plaintiff also reiterates that Dr. Moye has direct experience working with pharmaceutical companies as well as with the FDA. In terms of regulations applicable to postmarketing adverse drug events, the regulations speak for themselves. It is the application of the regulations to the facts of this case that gives rise to Defendant's motion. While Defendant makes much of the fact that there are differences in the premarketing and postmarketing regulations for reporting ADEs, Dr. Moye recognized this but explained that the intent of all of the reporting requirements is essentially the same. (Moye 3/23/00 Deposition, at 56–58.) In fact, Dr. Moye explains in his deposition that the FDA standards constitute the 'minimum' reporting requirements and that pharmaceutical com-

---

**36.** According to Defendant, premarketing ADEs are reported to the drug sponsor by clinical study investigators monitoring a limited number of subjects in a controlled environment. 21 C.F.R. §§ 312.64(b), 314.50(f)(2), 314.50(d)(5)(iv) & 314.50(d)(2)(i). Postmark-

eting ADEs are reported to the FDA by pharmaceutical companies as information about rare, latent, or long-term effects that were not identified during premarket testing. 21 C.F.R. §§ 310.305, 314.80 & 314.98.

panies may exceed what the FDA requires. (Moye 3/23/00 Deposition, at 78–81.) For this reason, Dr. Moye's experience with the FDA is sufficient to support opinion testimony regarding the applicable standard of care for reporting adverse drug events.

 Regarding FDA labeling requirements, Defendant asserts that Dr. Moye should not be allowed to provide opinion testimony about Wyeth's compliance, or alleged lack thereof.[37] The Court agrees since to allow such testimony would infringe upon the jury's role in determining an ultimate issue in the case. However, as Plaintiff points out, Judge Bechtle found that testimony from physicians, who were admittedly not experts in the regulatory field, were, in fact, qualified to opine on 'the medical facts and science regarding the risks and benefits of the diet drugs in question and to compare that knowledge with what was provided in the text of labeling and warnings on the diet drugs in question. In other words, [the physicians] are qualified to render an opinion as to the labels' completeness, accuracy, and ... the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits of the diet drugs in issue are or were at the time the labeling was published."[38] (PTO 1332 at 27–28.) The Court intends to follow the MDL Court's ruling.

 Defendant finally seeks to prohibit Dr. Moye from testifying about an alleged link between the side effects of Pondimin and Aminorex.[39] While this issue is discussed fully in conjunction with Defendant's Motion 5, the parties agree at least to some extent that any expert testimony regarding alleged chemical similarities in the two (2) diet drugs would have to be offered by a pharmacologist. Dr. Moye is clearly not a pharmacologist and, therefore, is not qualified. For this reason, he will be precluded from testifying about the alleged chemical similarities between the two (2) drugs.

### 5. *Defendant's Motion 5*

 Defendant seeks a ruling from the Court excluding evidence about Aminorex.[40] Defendant challenges any such testimony on the grounds that it lacks any reliable scientific basis in that Plaintiff's "chemically similar" theory based upon the presence of a phenylethylamine ("PEA") structure is flawed. In support, Defendant proffers the affidavit of Dr. Nancy Balter, pharmacologist, averring that there is no validity to the proposition that drugs with overlapping chemical structures are generally likely to have the same or similar therapeutic effects or side effects. Defendant also makes the argument that evidence of Aminorex would require a "mini-trial," would necessarily confuse and mislead the jury, and may result in unfair

---

37. The regulation cited by Plaintiff provides that:

> Labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. 21 C.F.R. § 201.57(e).

38. Judge Bechtle also noted that state law could have some bearing on this particular topic due to relevancy considerations. *Id.* at 28. If so, the parties should address relevancy issues in a *motion in limine*.

39. Aminorex is a weight loss drug linked to PPH in the 1960s and eventually removed from the market.

40. This motion could potentially affect the following witnesses: Drs. Tapson, Moye, Rich, and Barst.

prejudice, warranting exclusion pursuant to FED. R. EVID. 403.

According to Plaintiff, the side effects of Aminorex should have placed Defendant on notice that Pondimin would also increase the risk of PPH since the two (2) drugs have chemical similarities and are in the same drug 'class.' Plaintiff elaborates on its intentions, stating that it does not intend to present testimony about Aminorex as direct evidence that fenfluramine causes PPH because it is chemically similar to Aminorex. Plaintiff hopes to present testimony that the published medical literature regarding what Plaintiff describes as 'the Aminorex epidemic' should have put Wyeth on notice that the entire class of diet drugs might cause PPH. Pointing to references to the similarities as far back as 1981, Plaintiff contends that the medical literature should have spurred Defendant into action upon learning of the first PPH case reports associated with fenfluramine, and eventually prompted Defendant to change its product labeling.[41] Plaintiff fails to mention that the medical literature exploring the relationships between Aminorex, Pondimin, and PPH was not published until after the first PPH cases associated with fenfluramines occurred. For this reason, Defendant contends that it properly acted as others in the scientific community did in waiting for the IPPHS results before making changes to the Pondimin label.[42]

The MDL Court considered Aminorex evidence during its consolidated pretrial proceedings, yet deferred to the trial courts. (PTO 1332 at 23–25.) Judge Bechtle noted the pharmacological differences between Aminorex and Pondimin and stated that there "appears to be good ground to exclude an opinion" *that fenfluramine causes PPH because of its similarities to Aminorex, Id.* Judge Bechtle compared Plaintiffs' stated purpose for the evidence, namely, to show that the scientific community was on notice that anorexigens have long been associated with PPH. *Id.* He then predicted the trial court's dilemma in applying Rule 403 given that "Notice could very well be an issue with a negligence claim …" *Id.* Indeed, because Plaintiff's Complaint involves numerous allegations of negligence, evidence of Aminorex, another anorectic agent identified by the World Health Organization as a definite risk factor for PPH, is relevant in determining what Defendant knew or should have known about potential harms of fenfluramines such as PPH. FED. R. EVID. 401.

The more difficult issue is whether its probative value substantially outweighs the risk of unfair prejudice to the Defendant. FED. R. EVID. 403. However, the purpose for which Plaintiff offers this evidence, to establish notice rather than causation, tends to lessen the concerns described by Dr. Balter. In other words, aside from the common classification as anorexigens, the jury need not ascertain

---

41. In fact, Plaintiff includes a copy of an email dated July 16, 1996, regarding "Reportability of PPH cases," in which a Wyeth employee discusses the "flow (stream? river?)" of international, serious reports coming in. (MDL 1203 Plaintiffs' Exhibit # 00139)

42. Defendant argues that Plaintiff seeks to impermissibly hold Defendant accountable for information that was not available until after Pondimin related PPH cases were documented. Defendant describes Plaintiff's analysis

as benefitting from "20/20 Hindsight." Defendant misconstrues Plaintiff's argument in that Plaintiff merely seeks to introduce the Aminorex-related PPH cases as relevant background—or a starting point from which Defendant's own risk / benefit analysis should have begun. Whether this evidence should have placed Defendant on notice that PPH was a risk factor for Pondimin is a matter for argument.

the chemical similarities between the two (2) drugs, in order to find the Aminorex related PPH incidents are probative on the notice issue. Thus, testimony from a pharmacologist is not necessary.[43]

In *Benedi v. McNeil–P.P.C., Inc.*, the Fourth Circuit examined a similar evidentiary issue. Considering a negligent failure to warn claim, the Fourth Circuit upheld the admissibility of dissimilar case reports known as Drug Experience Reports ("DERs") for the purpose of proving notice, finding that they were "highly probative" despite various differences. *Benedi*, 66 F.3d at 1385–87. Although *Benedi* considered case reports involving the same drug, the appellate court's reasoning is instructive on this issue. The Fourth Circuit explained that the dissimilarities between plaintiff's situation and those reported in the DERs did not affect admissibility of the evidence, but rather went to the weight that the jury should give the evidence. *Id.* The Fourth Circuit further stated that when prior incidents are admitted to prove notice, the required similarity of the prior incidents to the case at hand is more relaxed than when prior incidents are admitted to prove negligence. *Id.* at 1386. Therefore, the incidents need only be sufficiently similar to make defendant aware of the potential danger. *Id.* Because Aminorex and fenfluramines are both anorectic agents, the jury should be able to consider whether Defendant should be considered to have been placed on notice that PPH was likewise a potential risk for fenfluramine users.

In addition, the fact that some of the medical literature on PPH was prompted by the Aminorex related PPH cases is a historical fact, or a piece of the puzzle so to speak. The extent that Defendant was aware of the Aminorex related PPH cases, if at all, its lack of involvement with Aminorex, and the fact that Aminorex was never marketed or distributed in the United States, can be brought out on cross-examination. The Court can also provide a limiting instruction warning the jury to limit their consideration of this evidence to whether or not Defendant knew, or should have known, of the alleged risks of its product. For these reasons, the Court cannot find that the probative value is substantially outweighed by the danger of unfair prejudice to Defendant.[44]

### 6. *Defendant's Motion 6*

■■■ Defendant seeks to exclude testimony concerning the possible biological mechanisms of action by which Pondimin may cause PPH. The gist of Defendant's argument is that because the biological mechanisms of Pondimin are unknown, a matter that is not disputed, Plaintiff's speculative theories do not satisfy *Daubert*.

As an initial matter, Plaintiff does not object to Defendant's motion to the extent it seeks to exclude opinions about the exact biological mechanism by which fenfluramines may cause PPH. However, Plaintiff seeks to introduce testimony regarding biological plausibility.[45] According to Plain-

**43.** As for which one of Plaintiff's witnesses is qualified to provide factual background regarding Aminorex-related PPH incidents, the alleged link between Aminorex and Pondimin, and the relevant literature, that question will be decided at trial.

**44.** The parties are encouraged, however, to consider: 1) whether a stipulation might lessen the impact of this evidence; and 2) the

manner in which evidence of Aminorex can be limited and / or addressed via special jury instruction preceding the testimony.

**45.** As already noted, "biological plausibility" is a recognized factor in epidemiology considered when determining whether a proven association, such as the association between

tiff, biological plausibility is relevant in light of Defendant's latency argument. Thus, Plaintiff contends that she is entitled to elicit testimony about the process of pulmonary arteriopathy and right ventricular hypertrophy, both of which take some time to develop according to Plaintiff's experts, in order to demonstrate that fenfluramine could continue to pose a risk years after exposure has ceased, or that this occurrence is consistent with existing knowledge. Although Defendant contends that opinions regarding biological plausibility are not relevant unless there is evidence suggesting that a relationship exists, and could not be supported by scientific evidence, the Court disagrees for the reasons discussed generally in relation to the admissibility of case reports. (See "III, 1") Further, Defendant's reliance on the Reference Manual is misplaced in that the weight that evidence of biological plausibility has in a given case is discussed—not admissibility of the evidence. *Reference Manual*, at 378.

Defendant also seeks to exclude testimony comparing the biological mechanisms of Pondimin with the way other substances affect the body. The undersigned agrees with Plaintiff that to grant this request would be somewhat unrealistic, and tantamount to foreclosing Plaintiff's experts from using medical analogies to help explain their testimony. There is nothing within FED. R. CIV. P. 26 that requires Plaintiff's experts to disclose their testimony verbatim to Defendant prior to trial. Any specific objection to the use of an analogy during testimony can be addressed contemporaneously with the objection. Defendant's Motion 6 will be *denied in part* and *granted in part*.

#### 7. *Defendant's Motion 7*.

Defendant requests, as an alternative to its first motion, that the testimony of Drs. Tapson and Dr. Rich should be restricted. Specifically, the areas of testimony Defendant seeks to preclude are: 1) the minimum period of exposure to Pondimin that is safe; 2) precipitation of secondary PH by Pondimin; 3) the adequacy of the Pondimin warning label; 4) outdated survival rates for PPH patients; 5) other physicians' opinions; and 6) the withdrawal of Pondimin from the market preventing a PPH epidemic. A review of Defendant's arguments, as well as Plaintiff's response, confirms that these issues do not arise in the context of *Daubert*, but are instead *motions in limine* essentially involving questions of relevancy. The Court will not decide these issues prematurely.

The Court does note, however, that the MDL Court has already determined that Dr. Rich is not qualified to provide expert testimony in the area of FDA regulatory standards. (PTO 1685) Accordingly, Dr. Rich will not be allowed to testify about whether the Pondimin label actually complied with regulatory standards.[46] Defendant's motion will be *granted* to that extent. However, also consistent with Judge Bechtle's directives, Dr. Rich is likely qualified to testify about the relevant medical facts and science and compare that knowledge with what was provided in the labeling and warning. It will be the jury's role to determine whether the labeling and warning was adequate. The Court will *defer ruling* on the remainder of Defendant's Motion 7 until trial.

#### 8. *Defendant's Motion 8*

Defendant's final motion requests that the Court exclude all evidence regarding

---

fenfluramines and PPH, rises to the level of a causal relationship.

**46.** The MDL Court also concluded that Dr. Rich was not qualified to opine about the efficacy of Pondimin and Redux for treating obesity. *Id.*

side effects of Pondimin other than PPH, namely, valvular heart disease or "VHD." In support, Defendant notes that Plaintiff does not have VHD, and doesn't allege so in her Complaint. Moreover, prior to initiation of this lawsuit, Plaintiff settled any claims she had against Defendant in a class action suit with the exception of injuries related to PPH.[47] (Defendant's Exhibit 96) Plaintiff opposes Defendant's motion, contending that evidence of VHD is directly relevant for purposes of her failure to warn claim and inadequate drug label claim. According to Plaintiff, evidence related to the VHD cases demonstrate Defendant's knowledge of risks associated with the use of fenfluramines, the risk / benefit analysis, and proximate cause or cause-in-fact. Additionally, Plaintiff points out that the VHD occurrences are what led to the withdrawal of fenfluramines from the market at the FDA's request and that it is an integral part of the background of this case. Defendant misstates the issue.

The issue presented regarding VHD evidence, not unlike the question of Aminorex evidence, is in actuality, a *motion in limine* pursuant to FED. R. EVID. 403 rather than a *Daubert* challenge. However, the Court will enter a ruling now in anticipation of trial. The Court generally agrees that any injuries Plaintiff suffers from other than PPH, with the exception of those physical observations that may be related to Plaintiff's PPH (such as right ventricular hypertrophy), are not relevant. The Court also agrees that pursuant to the Settlement, Plaintiff is prohibited from 'prosecuting' claims against Defendant that she has already agreed to release. However, the Settlement does not preclude Plaintiff from admitting facts into evidence that are relevant to the claims asserted here.

 Evidence regarding instances of VHD associated with fenfluramines as used to treat obesity is, in fact, relevant to demonstrate the knowledge of Defendant. Under North Carolina law, a products liability action based upon negligence requires the plaintiff to prove the following essential elements: 1) duty; 2) breach; 3) causation; and 4) damages. *Bryant v. Adams*, 116 N.C.App. 448, 465, 448 S.E.2d 832 (1994). A duty to warn arises when the supplier of a product knows or has reason to know that the product is, or can be, dangerous for the use for which it is supplied. *Stegall v. Catawba Oil Co.*, 260 N.C. 459, 133 S.E.2d 138 (1963). In order to prove causation, a products liability plaintiff asserting a failure to warn claim must show that the injury was caused by the defendant's failure to warn. N.C. Gen. Stat. § 99B–5. Defendant's knowledge, or lack thereof, regarding the potential dangers of its product are indeed relevant to the issues of duty and causation.

When considering a negligence claim based upon failure to warn, and specifically the element of causation, it is the decision process of Plaintiff, as opposed to the specific injury, that must be considered. *Haroutounian v. American Home Products, et al.*, LASC Case No. VC025742 (California Superior Court for the County of Los Angeles, Feb. 8, 2000) (Plaintiff's Response / Tab 13)(evidence of PPH rele-

---

47. In November 1999, Wyeth entered into a Nationwide Class Action Settlement Agreement ("Settlement"). The Settlement was preliminarily approved by the MDL Court in November 1999. After notice to the class, an opportunity to opt-out, and an evidentiary hearing, the Settlement was finally approved in August 2000. For Ms. Smith, and others who did not opt out of the class, the Settlement resolved all claims relating to alleged heart valve damage and / or other injuries allegedly caused by the use of Pondimin and Redux, with the exception of PPH.

vant to plaintiff's negligence claims based upon failure to warn of VHD associated with Pondimin use); *Bryant,* 116 N.C.App. at 466–67, 448 S.E.2d 832 (where plaintiff claims that he would have used product differently had he been adequately warned by defendant, jury question existed on proximate cause issue). Defendant's contention to the contrary is rejected.[48]

In this case, Plaintiff alleges that had she known of the risk of VHD associated with fenfluramine use, she would never have requested a prescription, or taken fen-phen. Similarly, Plaintiff presents an affidavit from Dr. Fisher, who was first to prescribe fen-phen for Plaintiff's obesity, in which Dr. Fisher avers that he would not have prescribed fen-phen had he been aware of the risks of VHD. (Fisher Affidavit, ¶ 6) Moreover, Plaintiff does not allege that she suffers from VHD and the jury can be instructed on this at the outset of the trial. Further, when this evidence is presented, Defendant's concerns regarding confusion of the issues can be addressed with a special cautionary instruction. In light of its probative value on the issue of notice to Defendant, duty to warn, and causation, the probative value of VHD evidence is not substantially outweighed by the risk of unfair prejudice to Defendant. FED. R. EVID. 403. Defendant's final motion will be *denied.*

### 1. *Plaintiff's Motion 1*

■ Plaintiff seeks to exclude expert testimony of Dr. Steven Koenig, a pulmonologist identified as Defendant's expert on causation. Dr. Koenig is from the University of Virginia and specializes in the area of "obesity-related pulmonary disor-

ders." Dr. Koenig contends that the IPPHS fails to establish an increased risk of PPH more than 1 year after exposure, a different interpretation than that offered by Dr. Rich. Based upon this, Dr. Koenig opines that Plaintiff's PPH could not have been caused by Pondimin use because her symptoms developed more than one year after exposure. (12–5–02 Trans. at 16; Koenig Affidavit, ¶ 7)

Plaintiff challenges Dr. Koenig's testimony, stating that his focus on latency between exposure and onset of PPH is error. More specifically, Plaintiff contends that: 1) Dr. Koenig is not qualified to give expert testimony on PPH causation; 2) that he cannot provide reliable support for his opinion regarding causation; 3) that his opinion lacks the requisite intellectual rigor that a practicing physician would apply; 4) that his opinion has not been subject to peer review; 5) that his opinion is not based on the treatment of Plaintiff, but rather in preparation for litigation; and 6) that his opinion cannot assist the jury and would be misleading. For the reasons set forth in response to Defendant's Motion 1, Dr. Koenig's opinion is admissible. Briefly, the Court will address Plaintiff's concerns with the reliability of Dr. Koenig's opinion.

While Dr. Koenig is not the leading expert in this area, he is qualified to provide expert opinion testimony regarding causation. Dr. Koenig is a licensed physican and surgeon in Virginia and Illinois, and a board-certified pulmonologist specializing in obesity-related pulmonary disorders. (Koenig Affidavit, ¶ 1) Dr. Koenig is currently an Associate Professor at the

---

**48.** Defendant cites *Bouchard* in support of its position that VHD evidence is not relevant. *Bouchard v. American Home Products Corp.,* 2002 WL 1760609 (N.D.Ohio, July 30, 2002). However, on this issue, *Bouchard* is distinguishable in that the plaintiff, who suffered from VHD rather than PPH, sought to introduce PPH evidence in hopes of recovering for speculative neurological injury, or *based upon the possibility that she might be more susceptible to the risk of PPH based upon her use of Redux.* Such is not the case here.

University of Virginia School of Medicine, where his responsibilities include teaching medical students at all levels. (12–5–02 Trans. at 6.) The University of Virginia Medical Center where Dr. Koenig teaches is a referral facility for pulmonary hypertension and primary pulmonary hypertension, exposing Dr. Koenig to volumes of PH and PPH patients. (12–5–02 Trans. at 4.) Dr. Koenig testified that he teaches his students, fellows, and residents how to diagnose PPH as well as how to treat it. (12–5–02 Trans. at 6.) Dr. Koenig admitted that he has not participated in scientific research or clinical trials concerning pulmonary hypertension or PPH and has not published in this discipline. (12–5–02 Trans. at 31–32.) Through his clinical practice, which consists of 70–75% of his time, Dr. Koenig has diagnosed and treated patients with both pulmonary hypertension and PPH. (Koenig Affidavit, ¶ 3)(12–5–02 Trans. at 5–6, 14–15.) Thus, the Court cannot find that Dr. Koenig's opinion lacks the requisite intellectual rigor that a practicing physician would apply. Indeed, Dr. Koenig is at least as qualified as Dr. Dalto to testify regarding causation.

As was true with Dr. Rich, Dr. Koenig's opinion is derived using the methodology of differential diagnosis, or what Dr. Koenig describes as a diagnostic "algorithm." [49] Pursuant to Dr. Koenig's analysis, once all other secondary causes of Plaintiff's PPH are ruled out, the IPPHS does not support Plaintiff's theory that her PPH is diet-drug induced. As discussed regarding Dr. Rich's differential diagnosis methodology, the Court will not exclude Dr. Koenig's testimony because it cannot be subjected to a conclusive scientific procedure or test. (See Section "III, 1") Likewise, there is no need to reiterate the acceptance of differential diagnosis methodology by the medical community and the Fourth Circuit or discuss potential error. *Id.* The Court will, however, scrutinize Dr. Koenig's application of the relevant principles and methods to the facts of this case in an effort to ensure it can assist the trier of fact. FED. R. EVID. 702.

During the evidentiary hearing, Dr. Koenig clarified that in forming his opinion, he did not rely exclusively on the past users odds ratio, which is not statistically significant, and that he does not interpret the IPPHS as conclusively finding that fenfluramine does not cause latent PPH. (12–5–02 Trans. at 7–8.) Even so, during cross-examination, Dr. Koenig was less than convincing. Dr. Koenig claimed that the overall 6.3 odds ratio was not the best odds ratio to apply in this case because it assessed the overall risk for the entire group and while the most proper odds ratio to apply to the general population, it did not take into consideration Plaintiff's specific characteristics. [50] (12–5–02 Trans. at 49–50.) According to Dr. Koenig, it would be "unscientific" to apply the overall odds ratio to a particular individual. (12–5–02 Trans. at 48.) Considering Plaintiff's specific characteristics,

---

**49.** Dr. Koenig was initially unable to rule out all secondary causes of Plaintiff's condition. Upon receiving Plaintiff's PCO2 levels, as measured by her arterial blood gases, Dr. Koenig recognized that sleep apnea and obesity hypoventilation could not be the cause of Plaintiff's pulmonary hypertension. (12–5–02 Trans. at 15–16.)

**50.** Plaintiff's counsel stated, and Dr. Koenig did not dispute, that 70% of the patients in the IPPHS were women, and that the median age at the time of onset for IPPHS subjects was 44.7 years. (12–5–02 Trans. at 56.) Plaintiff argues that because IPPHS was a case control study, whereby IPPHS patients were matched with controls of the same age, weight, gender, and geographic location, that Defendant's argument regarding the significance of Plaintiff's age and gender is weakened. The Court agrees.

namely, the additional facts regarding duration of use and timing of use, Dr. Koenig also found the 23.1 odds ratio for those users of at least three (3) months relevant, stating that because Plaintiff used fen-phen for at least three (3) months, she was clearly at an increased risk for PPH. (12–5–02 Trans. at 50.) Dr. Koenig fully agreed that the users for more than three (3) months category included patients like Plaintiff, whose first symptoms began more than a year after their exposure ceased. (12–5–02 Trans. at 51.) Minutes later, when asked to explain why the 23.1 odds ratio led him to believe that the risk doesn't persist more than a year after exposure, Dr. Koenig merely referred to the timing of use categories—which also do not consider a factor he admits is pertinent to Ms. Smith's diagnosis—her duration of use and subsequent increased risk. (12–5–02 Trans. at 51.) The Court finds Dr. Koenig's application somewhat contradictory in that he seeks to apply all of the relevant IPPHS data to the individual Plaintiff, but does not appear to do so.[51] Even Dr. Makuch, who sought to 'synthesize' the applicable IPPHS subgroup results, testified that the 2.4% odds ratio for past users did not adequately describe Plaintiff's risk because both the duration of use and the onset of symptoms must be considered. (12–4–02 Trans. at 84–85.) Immediately following, Dr. Makuch failed miserably in his attempt to explain why, in light of this concession, he determined that the past users odds ratio was the 'best possible match' to the facts of this case.[52] Therefore, the Court agrees that to the extent Dr. Koenig *solely* relies on the odds ratio for past users, his opinion is misleading and, therefore, unreliable. *Reference Manual,* pg. 359–60.

In support of Dr. Koenig's conclusions, Defendant contends that Dr. Koenig's opinion is consistent with that of the FDA's independent epidemiologist and medical review officer. (Defendant's Exhibits 61–63) However, Plaintiff, with a "healthy dose of skepticism," points out that the information Defendant relies upon was based on preliminary data from the IPPHS—not the final version of the study.[53] Plaintiff goes on to argue that Dr. Koenig's testimony is unreliable because he ignores Plaintiff's attributable risk in rendering his opinion.[54] While it is

---

51. Notwithstanding the expertise of Drs. Koenig and Makuch, common sense does not seem to support Defendant's theory. Not only does Dr. Koenig refuse to apply the overall odds ratio that takes into account the relevant factors in this case (i.e., duration of use and past use), but Dr. Koenig ignores a statistically significant odds ratio (i.e., users for greater than 3 months) that applies here with just as much certainty as the past users category relied upon.

52. When asked what in the long-term use category (23.1 odds ratio) led him to believe that this increased risk only applied in the first year of exposure, Dr. Makuch stated that there was "nothing in the duration of use that indicates that to be the case." (12–4–02 Trans. at 90.)

53. By way of demonstration, Plaintiff compares the Pondimin entries from the 1997 and 1998 Physician's Desk Reference. (Plaintiff's Reply at 5–6.) The preliminary results of the IPPHS were first made available in March 1995, with final data being available by February 6, 1996. (MDL Exhibit 1977) According to Plaintiff, the 1997 PDR entry understated the risk of PPH for people who used it for at least 3 months and the 1998 PDR entry quoted accurate figures.

54. Attributable risk refers to the amount of disease among exposed individuals that can be attributed to the exposure. *Reference Manual,* pg. 351–52. Plaintiff calculates Plaintiff's attributable risk, as someone who used fenfluramines for at least three (3) months, to be approximately 96%. According to Plaintiff, given the attributable risk, Plaintiff's use of fenfluramines is clearly the most probable cause of her PPH and Dr. Koenig's opinion to the contrary is unreliable.

not the Court's role to assess the credibility of the witnesses, Dr. Koenig's hesitation when asked whether fenfluramines cause PPH was also troubling.[55] (12–5–02 Trans. at 41–43.) However, these matters will be for the jury to decide. Dr. Koenig's opinion is not unreliable merely because he has a different opinion than that of Plaintiff's expert. Stated simply, *Daubert* and its progeny does not eliminate the need for, or otherwise prohibit, a "battle of the experts" as long as each of the expert's reasoning and methodology is sound.[56]

In terms of the potential or known rate of error, Plaintiff reiterates that strict statistical significance testing by Dr. Koenig is unreliable in this context. According to Plaintiff, statistical significance testing is likely to produce a Type II error in light of the sample size (7 case patients) and the fact that Dr. Koenig tries to analyze a subset of patients from the larger study which was not designed to determine the issue in question.[57] Although the Court agrees with Plaintiff that the real question surrounding the past users odds ratio is whether it reflects a true association or whether it could have resulted from sampling error, the Court also rejects Plaintiff's alternative proposal to conduct confidence interval assessment.[58] Indeed, it may be that the expert testimony should not encompass any discussion of the past users odds ratio.

Finally, despite the Court's concerns with Dr. Koenig's analysis, this Court cannot substitute its judgment for that of a qualified expert. Nor should the expert testimony be excluded unless the analysis or reasoning is such that the expert "lacks 'good grounds' for his conclusions." *In re Paoli*, 35 F.3d at 746; *Daubert*, 509 U.S. at

**55.** Dr. Koenig accurately asserted that in determining whether an "association" supports general causation, consistency is to be considered. Consistency is difficult to establish, however, where there is only one epidemiological study, the IPPHS. As Plaintiff points out, and this Court agrees, this is not a situation where there is any real question as to *general causation.* To the contrary, fenfluramines were taken off the market by the FDA and the World Health Organization has declared fenfluramines a "definite risk factor," or a factor "considered to play a causal role in the development of the disease." Dr. Koenig eventually admitted that his response to the question posed regarding "association" versus "cause" was *purely semantic,* and that he diagnosed his patients in light of the only study that was available, namely the IPPHS. It is in this context in which the Court considers the issues presented in the parties' *Daubert* motions.

**56.** It is appropriate to attribute this comment, while not verbatim, to The Honorable William W. Schwarzer, U.S. District Court for the Northern District of California. This issue was discussed during a recent broadcast sponsored by the Federal Judicial Center entitled, "Science in the Courtroom, Program 6: Daubert Issues in Toxic Tort Cases" and featuring views of The Honorable Barbara Rothstein, U.S. District Court for the Western District of Washington, The Honorable William W. Schwarzer, U.S. District Court for the Northern District of California, and Attorneys Elizabeth J. Cabraser, and Nathan A. Schachtman.

**57.** Plaintiff cites Dr. Poole's assertion that the rate of Type II error in Dr. Koenig's application of statistical significance testing to the IPPHS' adjusted odds ratio for past users is over 70%. (Poole Affidavit, ¶ 9) (Type II error would be failing the reject the null hypothesis when there IS an association.)

**58.** As an alternative to statistical significance testing, and in support of introducing the past users category data, Plaintiff suggests computing summary measures of the likelihood function. According to Plaintiff, Dr. Poole's computations using this approach reveal that the IPPHS supports an increased risk of PPH from past exposures with an odds ratio of 5.8. Plaintiff also cites similar computations by Dr. Sander Greenland that found that IPPHS' results for past users support a doubling or trebling of the risk of PPH more than 1 year after exposure.

590, 113 S.Ct. 2786. Due to the latency issue presented here and the inability to conclusively identify diet-drug induced PPH, the Court, in its broad discretion, finds that 'good grounds' exist for Dr. Koenig's conclusion in this case. The ultimate issue on causation must be determined by the jury.

### 2. *Plaintiff's Motion 2*

 Plaintiff also seeks to exclude testimony of Defendant's experts in the areas of obesity, the efficacy of Pondimin and Redux, and risk / benefit analysis. Defendant proposes to offer testimony from Dr. Kenneth W. Rictor, previously identified as a generic expert witness by the MDL Judge (PTO 417), and Dr. Marta M. Kalinski, who seeks to provide case-specific testimony.[59]

In support of her motion to exclude Dr. Rictor's testimony, Plaintiff argues that Dr. Rictor's opinion should be excluded under Rule 702 because he relies primarily on his own clinical experience rather than on the published medical literature. Plaintiff further contends that Dr. Rictor's opinion related to the benefits of Pondimin and Redux were not derived through the use of an appropriate scientific method. However, rather than truly challenging the basis of Dr. Rictor's opinion, Plaintiff seems to disagree with the merits or substance of his opinion. More specifically, Plaintiff disagrees that Pondimin was ever an effective treatment for weight loss, arguing that it offered only short-term benefits because weight was usually re-gained, that weight loss plateaus after six (6) months or so, and that the potential side effects outweighed any benefit. According to Plaintiff, the use of fenfluramines for treatment of obesity provided no long-term health

benefits and, therefore, was not more effective than other methods of weight loss. Plaintiff also objects generally to generic testimony regarding obesity as not helpful to the trier of fact. Plaintiff's motion will be *denied.*

As an initial matter, the Court summarily denies Plaintiff's motion to the extent she claims that expert testimony regarding obesity, co-morbidities associated with obesity, treatment choices for obesity, and the risks and / or benefits of treating obesity will not be helpful to the trier of fact under FED. R. EVID.702. Each of these issues are highly relevant to the issues raised by Plaintiff's Complaint. As Defendant noted in its response, obesity is "why we're here" so to speak. In addition, the Court's review of the briefs and exhibits provided on this issue reveal that there is published medical literature supporting the positions of both Plaintiff and Defendant on this issue. Thus, Plaintiff's claim that Defendant's experts do not rely on the medical literature is unfounded. While the Court does not purport to have read each and every publication cited, neither does the undersigned purport to usurp the role of the scientists by trying to determine which view is more accurate. Moreover, Plaintiff cannot dispute that the FDA found fenfluramines beneficial enough in treating obesity to approve their use. It is true that this is only one factor to consider, and certainly not determinative as Defendant seems to allege. The jury will have the benefit of hearing from experts on both sides weigh the benefits and risks associated with fenfluramines in the treatment of obesity.

 Although Plaintiff does not question Dr. Kalinski's expertise in his areas of

**59.** Because Dr. Rictor has already been deemed a generic expert witness by the MDL Court, and because Plaintiff does not appear to challenge Dr. Rictor's qualifications, there is no reason to discuss Dr. Rictor's qualifications in these areas.

interest, Plaintiff alleges that Dr. Kalinski's proffered opinions are not scientifically valid in the following areas: 1) use of fenfluramines were a safe and effective method of weight loss; 2) use of fenfluramine and dexfenfluramine reduced co-morbidities associated with obesity; and 3) the potential benefits outweighed the risks of using fenfluramines. According to Plaintiff, Dr. Kalinski failed to compile, summarize, compare, and analyze her own clinical cases to support her opinion. In other words, Plaintiff claims that Dr. Kalinski should have compared results of her own patients taking fenfluramines and compared the benefits with the results achieved by her patients who followed a regime of diet and exercise alone. Dr. Kalinski conceded during her deposition that she did not scientifically measure the benefits in the manner described by Plaintiff and admitted that *to the extent her opinions were based upon clinical experience, there was no way to verify them with any accepted scientific method.* (Kalinski Deposition at 53–54.) Because Dr. Kalinski's clinical experience is sufficient, her 'admission' is of no moment. *Kumho Tire,* 119 S.Ct. at 1178 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.") In fact, it seems that a practicing physician who sought to concoct a "case-controlled study" with her own patients would be the exception rather than the rule. Plaintiff's motion in this regard borders on frivolous. Again, Plaintiff merely disagrees with the substance of Dr. Kalinski's analysis and raises issues that are certainly ripe for cross-examination, but not sufficient to render Dr. Kalinski's opinion unreliable. *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") For the reasons set forth, Plaintiff's Motion 2 is *denied.*

## IV. CONCLUSION

For the reasons set forth herein, Defendant's Motion To Exclude Evidence is hereby **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's Motion to Exclude Evidence is **DENIED.**

**IT IS, THEREFORE, ORDERED THAT:**

1) Defendant's Motion to Exclude is hereby **GRANTED in part** and **DENIED in part** consistent with the terms of this Order -

 i) Defendant's Motions 1, 2, 4 and 6 are hereby **GRANTED in part** and **DENIED in part;**

 ii) Defendant's Motions 3, 5 and 8 are hereby **DENIED;**

 iii) Defendant's Motion 7 is **GRANTED in part.** However, in large part, the Court's ruling on Defendant's Motion 7 will be **DEFERRED** until the time of trial;

2) Plaintiff's Motion to Exclude Expert Testimony of Dr. Koenig is hereby **GRANTED in part** and **DENIED in part;**

3) Plaintiff's Motion to Exclude Expert Testimony of Drs. Rictor and Kalinski **DENIED;** and

4) Defendant's dispositive motions must be filed no later than 4:30 pm on April 25, 2003. Plaintiff's response will be due on April 30, 2003 and Defendant's reply, if necessary, must be submitted by May 6, 2003.